UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

*******************************
JOHN DOE,                              *
     Plaintiff                       *
                       *
v.                                     *
                       *        C. A. No. 1:15-cv-13250-LTS
TOWN OF WAYLAND, THE                   *
EDUCATION COOPERATIVE                  *
MARLENE MOSKOWITZ-                     *        **ORAL ARGUMENT REQUESTED**
DODYK, MARY MOEs 1-5, and              *
MICHAEL MOEs 1-5,                      *
     Defendants                      *
*******************************

**PLAINTIFF'S OPPOSITION TO DEFENDANT TOWN OF WAYLAND, DEFENDANT THE EDUCATION COOPERATIVE, and DEFENDANT MARLENE MOSKOWITZ-DODYK'S MOTION TO DISMISS**

**I. INTRODUCTION**

The Court should not dismiss the claims John Doe ("John") filed against Town of Wayland ("Wayland"), The Education Cooperative ("TEC"), and Marlene Moskowitz-Dodyk ("Moskowitz-Dodyk") because, as this memorandum will show, John's pleadings meet the requirements necessary to survive a 12(b)(6) motion to dismiss. Defendants prioritized fiscal considerations over the safety and well-being of their students through affirmative acts and as a part of a practice and custom employed by Wayland and TEC to maximize student participation in the TEC program, regardless of students' educational needs or propensity to harm other students. These actions deprived John of his constitutional rights, claims 1-3 in the present action. Defendants' response to the sexual abuse of John was unreasonable in light of known circumstances, contrary to John's rights under 20 U.S.C. Sections 1681 through 1686 ("Title IX"), claims 4-5 in the present action. Dismissal of John's claims is inappropriate.

## II. STATEMENT OF FACTS

For over twenty years, TEC has provided special education services on Wayland High School's campus. Amend. Compl. ¶¶ 8, 10. These two defendants maintained this arrangement through a contract. *Id*. ¶ 19. This contract calculated rates for services based on the type of programming, minimum number of students in a particular program, and also required payments beyond the termination date, if a student terminated his or her participation in TEC programming. *Id*. When enough students are terminated from a given program, Wayland is required to pay a higher rate for remaining participants. *Id*. ¶ 42. If the student terminated from the program is a Wayland Public Schools student, Wayland would need to pay the cost of a different placement, even if it is more expensive. *Id*. ¶ 53. As a result, Wayland and TEC Staff[1] ("Staff") encouraged friendships between students, even where a student posed a threat to others, as a means of increasing retention in the TEC program.

In approximately 1995, when Christopher Coe ("Coe") was fifteen years old, he sexually abused two boys in Belmont, Massachusetts. *Id*. ¶ 24. Coe received probation for these acts. *Id*. ¶ 25. In approximately 1996, Coe enrolled in TEC's Learning and Vocational Center ("LVC") at Wayland High School. *Id*. ¶¶ 8, 25. Wayland and TEC Staff knew of Coe's history of sexually abusing children and instituted a policy that required employees to supervise Coe at all times. *Id*. ¶¶ 27-28.

John's older brother, Philip Doe ("Philip"), also attended LVC. *Id*. ¶ 21. Staff actively encouraged the friendship between Coe and Philip. *Id*. ¶ 30. During Philip's progress meetings, Staff told John and Philip's parents, Sarah Doe ("Sarah") and Robert Doe ("Robert"), that Philip would benefit from a closer friendship with Coe. *Id*. ¶ 32. Even though Staff knew Robert and

---

[1] Unless otherwise indicated, "Staff" is meant to include Defendant Moskowitz-Dodyk, a staff member with the authority to decide which students attended the TEC program. *Amend. Compl.* ¶ 15.

Sarah had several small children, they encouraged Sarah and Robert to support a friendship between the two, including spending time with one another outside of school and at the Doe home. *Id.* ¶¶ 33, 35. Staff did not advise Sarah and Robert of Coe's criminal history or advise that Coe should receive some type of supervision in their home. *Id.* ¶¶ 35-36. Instead, Staff told Sarah and Robert that Coe was both "a good kid" and "good with kids." *Id.* ¶ 34.

Staff failed to supervise Coe, and he sexually abused another student, Rachel Roe ("Rachel") on at least two occasions from approximately 1998 to 1999. *Id.* ¶ 39. When Staff learned of the most recent instance of sexual abuse, they failed to notify parents, remove Coe from LVC, or alter their supervision of Coe. *Id.* ¶ 40. Staff continued to encourage the friendship between Coe and Philip. *Id.* ¶ 43. A few months after Coe began sexually abusing Rachel, he began sexually abusing John, then four years old.[2] *Id.* ¶¶ 44-45. Almost every instance of abuse occurred at the Doe home when Coe visited Philip. *Id.* ¶ 46. This abuse continued after John enrolled in kindergarten in the Wayland Public Schools. *Id.* ¶ 56. Acts of sexual abuse included masturbation and penis to buttocks contact. *Id.* ¶ 57. During this period time, Sarah and Robert considered placing Philip in a different program, but Moskowitz-Dodyk begged Sarah to keep Philip in LVC. *Id.* ¶ 49. Moskowitz-Dodyk told Sarah that Philip's friendship with Coe was important and removing Philip would end this friendship. *Id.* ¶ 50.

The abuse only ended after John, then six years old, reported the abuse to an adult in July, 2000. *Id.* ¶ 58. Coe pled guilty to four counts of Indecent Assault and Battery on a Child Under 14, Mass. Gen. L. c. 265 § 13B, for the abuse of John. *Id.* ¶ 60. In the following weeks and

---

[2] Defendants' Memorandum drew the Court's attention to paragraph 22 of John's Amended Complaint: "At all times relevant to this action, John was a student in the Wayland Public School System." Def. Mem. at 2 n.2. Defendants argue this, along with paragraphs 45, 55, and 56, which showed the abuse began before and continued after John enrolled in kindergarten, is contradictory. Def. Mem. at 2 n.2. Defendants argue, "This inconsistency serves as an independent basis to disregard plaintiff's allegation of his status." It is unnecessary and unwarranted to disregard John's assertion that he was a student because a reading of these four together show the abuse occurred while John was a student in the Wayland Public Schools.

months, Coe threatened and harassed Philip because John reported Coe's abuse. *Id.* ¶¶ 62-64. Sarah contacted Staff, including the principal of Wayland High School, and reported both Coe's abuse of John and threats against her family. *Id.* ¶¶ 65-78. Staff refused to remove Coe from LVC or provide assurances for Philip's safety. *Id.* Coe was not removed until Sarah reported the abuse and threats to Superintendent Gary Burton. *Id.* ¶¶ 79-80.

Because of the sexual abuse, John began therapy where he was diagnosed with Post-Traumatic Stress Disorder (PTSD) in July 2000. *Id.* ¶¶ 83-84. Sarah informed Claypit Hill Elementary School of John's PTSD diagnosis and was assured it would remain in John's file for the duration of his education in Wayland Public Schools. *Id.* ¶¶ 87-88. In 2006, John showed signs of depression and his academic performance began to decline. *Id.* ¶¶ 89-90. As a Wayland High School freshman in 2009, John could not concentrate and began to fail classes, so Sarah and Robert spoke with John's guidance counselor, who said the school had no knowledge of John's PTSD diagnosis. *Id.* ¶¶ 91-92.

Over the next several years, Sarah and Robert advocated for recognition of John's PTSD and services that would address his PTSD symptoms. *Id.* ¶¶ 94-132. Staff—despite speaking with Sarah after Coe's sexual abuse of John, seeing a copy of the PTSD diagnosis, and repeatedly receiving notice from Sarah of John's PTSD and its cause—refused to acknowledge or treat John's PTSD. *Id.* ¶¶ 94-132. Staff insisted that John only suffered from a communication problem and John's Individualized Education Plan ("IEP") could not also reflect a diagnosis of PTSD. *Id.* ¶¶ 97-98. John failed to improve, so Staff informed Sarah and Robert that John must attend a TEC program in Newton. *Id.* ¶ 100. Sarah and Robert resisted, reminded Staff that Coe was a student in a TEC program, and requested John attend a therapeutic school to receive treatment for his

PTSD.  *Id.*  ¶ 101.  Staff told Sarah and Robert they must send John to TEC and promised therapy would begin immediately after John's enrollment.  *Id.*  ¶ 102.

Staff continued to monitor John's IEP after he began at TEC and John did not receive therapy.  *Id.*  ¶¶ 104-05, 114.  After multiple requests for therapy, Staff told Sarah they did not believe John suffered from PTSD, but believed he smoked marijuana, which caused academic problems.  *Id.*  ¶¶ 104-09.  John never had any disciplinary problems at school related to drug use; his only behavior problems were absences due to PTSD symptoms.  *Id.*  ¶¶ 110-11.  In January 2013, Staff held an IEP meeting where they told John he would not graduate and could stay in school only if he attended a drug program of their choice.  *Id.*  ¶¶ 115-16.  John refused to attend a drug program and was suspended from TEC.  *Id.*  ¶ 117.

A few days after the January, 2013 meeting, John, Sarah, and Robert attended another meeting with Staff.  *Id.*  ¶ 119.  There, Sarah expressed concern that her family was being victim-blamed for the sexual abuse and again asked them to send John to a therapeutic school.  *Id.*  ¶¶ 120-21.  Staff denied this request.  *Id.*  ¶ 122.  After this meeting, Sarah called an education lawyer whose intervention led to John's enrollment in Dearborn Academy ("Dearborn") in March, 2013.  *Id.*  ¶¶ 126-28.  At Dearborn, John received therapy, and his therapist observed John's avoidance strategies, which related to the childhood sexual abuse.  *Id.*  ¶ 129.  John's grades improved, and Dearborn staff informed Sarah and Robert that John most likely never suffered from a communications disability.  *Id.*  ¶¶ 130, 132.  This litigation followed.

### III. ARGUMENT

#### A.     STANDARD FOR A MOTION TO DISMISS

John alleged facts and reasonable inferences sufficiently plausible to survive a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted.  FED. R.

Civ. P. 12(b)(6). Even under the pleading standards of *Bell Atlantic Corp. v. Twombly*, John's claims are sufficiently plausible to survive Defendants' motion. *See generally* 550 U.S. 544 (2007). Under this standard,

> [w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level, [based] on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

*Id*. at 555 (citations omitted).

The United States Supreme Court outlined its plausibility standard: "Asking for plausible grounds to [make an inference], does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [of the claims]." *Id*. at 556. In other words, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Id*. (citations omitted).

The issue when considering a motion to dismiss "'is not whether there is a plausible alternative to the plaintiff's theory; the question is whether there are sufficient factual allegations to make the complaint's claim plausible.'" *Evergreen Partnering Group, Inc. v. Pactiv Corp.*, 720 F.3d 33, 45 (1st Cir. 2013) (quoting *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162,189 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 846 (2013)). In considering a motion to dismiss, courts cannot occupy the position of factfinder and choose another theory to explain the conduct of the parties. *See id*. at 50 ("[The district court] improperly occupied a factfinder role when it both chose among plausible alternative theories interpreting defendants' conduct and adopted as true allegations made by defendants in weighing the plausibility of theories put forward by the

parties."). Where the Court believes that additional facts can and should be pled, it may dismiss claims without prejudice. *See Pollard v. Georgetown Sch. Dist.*, No. 14-cv-14043-DJC, 2015 U.S. Dist. LEXIS 125099, at *24-25 (D. Mass. Sept. 17, 2015).

At issue in Defendants' Motion are several civil rights claims. The United State Supreme Court provides an exception to *Twombly* for such civil rights claims, requiring only notice pleading, not *Twombly*'s heightened pleading standard. *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 167-68 (1993) (rejecting requirement that civil rights plaintiffs must plead detailed facts with particularity); *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (continuing to apply notice pleading standards to a civil rights complaint—rather than a heightened standard—after *Twombly*). This proposition is congruent with *Twombly* as the Court stated it was not "require[ing] heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face," to "nudge [the claims] across the line from conceivable to plausible." 550 U.S. at 555, 570.

### B. JOHN ALLEGES SUFFICIENT CLAIMS AGAINST DEFENDANTS FOR RELIEF UNDER 42 U.S.C. §1983.

The affirmative acts of Moskowitz-Dodyk and the custom of TEC and Wayland resulted in a deprivation of John's constitutional rights, actionable via Section 1983. These claims are not precluded by John's Title IX claims. *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257-58 (2009) ("Title IX was not meant to be an exclusive mechanism for addressing gender discrimination in schools, or a substitute for § 1983 suits as a means of enforcing constitutional rights.").

In analyzing John's claims, this statute must be liberally construed: "A broad construction of § 1983 is compelled by the statutory language, which speaks of deprivations of *any* rights, privileges, or immunities secured by the Constitution and laws. Accordingly, we have repeatedly

held that the coverage of § 1983 must be broadly construed." *Dennis v. Higgins*, 498 U.S. 439,

443 (1991) (citations and quotations omitted) (emphasis in the original).

1.     **MOSKOWITZ-DODYK IS LIABLE FOR HER AFFIRMATIVE ACTIONS, WHICH CREATED THE DANGER THAT RESULTED IN THE SEXUAL ABUSE OF JOHN.**

a.     **MOSKOWITZ-DODYK'S CONSCIENCE-SHOCKING AFFIRMATIVE ACTS CREATED OR ENHANCED THE DANGER TO JOHN.**

While addressing the state-created danger doctrine in their Memorandum, Defendants

correctly stated that the doctrine attaches where a state actor creates or enhances a danger that

leads to a deprivation of the plaintiff's constitutional rights. Def. Mem. at 9.  However, Defendants

both misstated the First Circuit's rejection of the state-created danger doctrine and

mischaracterized applicable case law.  Def. Mem. at 8-10.  These cases cited to do not stand for

the proposition that the First Circuit does not recognize state-created danger doctrine claims; they

illustrate the doctrine's limitations.  *See Enwonwu v. Gonzales*, 438 F.3d 22, 30-31 (1st Cir. 2006)

(discussing the state-created danger doctrine and its inapplicability to non-citizens seeking to avoid

removal from the United States); *Rivera v. Rhode Island*, 402 F.3d 27, 35-37 (1st Cir. 2005) ("This

court has, to date, . . . never found [the doctrine] actionable on the facts alleged.") (determining

the alleged facts to not satisfy the affirmative acts requirement of the state created danger doctrine);

*Pollard*, 2015 U.S. Dist. LEXIS 125099, at *4-6, 28-29 (discussing the history and elements of a

claim under the state-created danger doctrine and holding that the bullying of a teenage student

failed to meet the theory's requirement that the conduct shocks the conscience).

In fact, "every circuit, except for the fifth, has embraced the concept of state-created danger

. . . ." Laura Oren, *Safari into the Snake Pit: The State-Created Danger Doctrine*, 13 Wm. & Mary

Bill Rts. J. 1165, 1173 (2005) (citing cases showing that the Fifth Circuit remains open to the

doctrine). "[A]lthough the government's failure to protect an individual from third-party private violence (even in the face of a known danger) ordinarily does not constitute a due process violation, [pursuant to the United State Supreme Court's decision in *DeShaney v. Winnebago County Department of Social Services*], we have recognized that the Due Process Clause may be implicated where the government affirmatively acts to increase the threat to an individual of third-party private harm or prevents that individual from receiving assistance." *Coyne v. Cronin*, 386 F.3d 280, 287 (1st Cir. 2004).

Defendants cited the Third Circuit's test for the state-created danger doctrine.[3] Def. Mem. at 9 (citing *Bright v. Westmoreland Cnty*, 443 F.3d 276, 281 (3rd Cir. 2006), *cert. denied*, 549 U.S. 1264 (2007); *see Kane v. Chester Cnty. Dep't of Children*, 10 F.Supp.3d 671, 690 (E.D. Pa. 2014) (stating the test from *Bright* is the Third Circuit test). Defendants do not provide any case law showing the First Circuit has adopted this test; Plaintiff's counsel could find none. In the First Circuit valid state-created danger doctrine claims must (1) involve affirmative state action that creates or enhances the danger that caused the harm; and (2) the state action must shock the conscience. *See Rivera*, 402 F.3d at 35; *Coyne*, 386 F.3d at 287; *Hankey v. Town of Concord-Carlisle*, No. 13-cv-11870-IT, 2015 U.S. Dist. LEXIS 132915, at *40-41 (D. Mass. Sept. 30, 2015); *Pollard*, 2015 U.S. Dist. LEXIS 125099, at *29-30. "[A] federal court may elect first to address whether the governmental action at issue is sufficiently conscience shocking." *Rivera*, 402 F.3d at 36 (citing *Cnty of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998)).

---

[3] This test is largely the same test applied in the First Circuit; however, the Third Circuit also requires the harm and victim are reasonably foreseeable. *See Bright v. Westmoreland Cnty*, 443 F.3d 276, 281 (3rd Cir. 2006), *cert. denied*, 549 U.S. 1264 (2007). While John does not need to show foreseeability in opposition to Defendants' Motion, the victimization of John as well as the nature of the victimization were both foreseeable. TEC and Westwood Staff actively encouraged a family they knew had small children to host Coe. *See supra* Part II. Staff knew Coe sexually assaulted two young boys before enrolling in LVC and that he sexually assaulted a third student while in LVC. *See supra* Part II.

"The conscience-shocking standard is not a monolith; its rigorousness varies from context to context." *Coyne*, 386 F.3d at 288 (citing *Lewis*, 523 U.S. at 850). "The spectrum is wide because substantive due process violations tend to come in various shapes and sizes and in a multitude of configurations." *Id*. "Courts have held that acts must be such as to offend even hardened sensibilities, uncivilized and intolerable, offensive to human dignity, or must constitute force that is brutal, inhumane, or vicious." *Cummings v. McIntire*, 271 F.3d 341, 344 (1st Cir. 2001) (citations and quotations omitted). "[W]here actual deliberation on the part of the governmental defendant is practical, the defendant may be held to have engaged in conscience-shocking activity even without actual malice . . . ." *Coyne*, 386 F.3d at 288. In such situations, deliberate indifference[4] may rise to the level of conscience-shocking behavior. *Id*.; *J.R. v. Gloria*, 599 F. Supp. 2d 182, 195 (D.R.I. 2009) ("The distinction lies with whether state actors have the luxury of time, forethought and 'reasoned and rational decisions.' If they do, deliberate indifference may rise to the level of a conscience-shocking constitutional violation."); *see Doe v. Merrill Community School District*, 610 F.Supp.2d 789, 816 (E.D. Mich. 2009) (stating that the defendant-school's affirmative act of enrolling a known perpetrator of sexual abuse may have been deliberately indifferent and conscience shocking).

In *Cummings*, the First Circuit considered cases in explaining the conscience-shocking element of a Due Process Clause claim. 271 F.3d at 345-47. Plaintiffs prevailed in cases that ". . . involve[ed] serious physical intrusions or sustained abuse . . . ." *Id*. at 346. As part of this analysis, the Court cited *Morris v. Dearborne*, a case where the affirmative conduct at the school caused the

---

[4] Defendants incorrectly asserted that conscience-shocking behavior must be more than deliberate indifference. Def. Mem. at 9. Defendants cite in support *County of Sacramento v. Lewis*; there, the United States Supreme Court considered whether deliberate indifference was the appropriate standard to measure the conduct of state actors during a high-speed law enforcement chase. 523 U.S. 833 at 849-52 ("Thus, attention to the markedly different circumstances of normal pretrial custody and high-speed law enforcement chases shows why the deliberate indifference that shocks in the one case is less egregious in the other (even assuming that it makes sense to speak of indifference as deliberate in the case of sudden pursuit.")).

constitutional deprivations in the home. *Id*. at 346 (citing 181 F.3d 657, 668 (5th Cir. 1999)). In *Morris*, a teacher made a false allegation of sexual abuse against her student's father, Jim Morris. 181 F.3d at 663. As a result, both parents lost custody of their daughter for three years, Mr. Morris's employer terminated him, and the allegations destroyed Mr. Morris's marriage. *Id*. at 664. The Court held the fabricated report of sexual abuse and resulting harm shocked the conscience. *Id*. 668.

Notably, in *Hasenfus v. LaJeunesse*, the Court discussed *Armijo v. Wagon Mound Public Schools*. 175 F.3d 68, 73-74 (1st Cir. 1999) (citing 159 F.3d 1253, 1261-62 (10th Cir. 1998)). There, the plaintiff, a teenaged special education student, threatened suicide, and school officials brought him to his home where firearms were available. *Armijo*, 159 F.3d at 1264. In *Hasenfus*, the Court did not embrace or reject the Tenth Circuit's holding that a jury may find such facts shocked the conscience, but distinguished the facts from *Hasenfus*. 175 F.3d at 74 (citing *Armijo*, 159 F.3d at 1263-64). The First Circuit's discussions of *Morris* and *Armijo* show it recognizes the state-created danger doctrine may apply where affirmative conduct at the school caused the constitutional deprivations in the home.

Turning to the affirmative act requirement, Defendants attempt to liken the present action to *Hasenfus* where the plaintiff filed suit against her teacher, among others, following a suicide attempt minutes after the teacher sent the student away from the class. Def. Mem. at 10; 175 F.3d at 69-70. The plaintiff proceeded under the state-created danger doctrine and alleged the teacher knew or should have known that the plaintiff was distressed and should not have been sent away unsupervised. *Hasenfus*, 175 F.3d at 70. The Court rejected this argument: "It would be hard to wrest even a claim of negligence out of these facts." *Id*. at 73. Other case law illustrates affirmative acts which satisfy this requirement.

In *Billingsley v. Franklin Area School District*, the Court stated the plaintiff met the basic requirements for a state-created danger doctrine claim. No. 11-160, 2012 U.S. Dist. LEXIS 10074, at *15 (W.D. Pa. Jan. 27, 2012). The plaintiff-student alleged that the defendant-teacher issued a hall pass to her; minutes later, issued a hall pass to her rapist; and knew of the rapist's sexually aggressive behavior and prior sexual assault of another female student. *Id.* at *2-3. Similarly, in *Merrill Community School District*, the Court found the plaintiff—a student and victim of rape by a peer—fulfilled the basic requirements of a state-created danger doctrine claim when school officials chose to enroll a student previously charged with second- and third-degree criminal sexual conduct. 610 F.Supp.2d at 796, 816.

In the present case, Moskowitz-Dodyk had ample time to consider her actions, so the deliberate indifference standard applies to an evaluation of whether her conduct shocked the conscience. Moskowitz-Dodyk prioritized the fiscal interests and contractual obligations of TEC and Wayland over the best interests of her students and families, which created—or at the very least enhanced—the danger that cause the sexual abuse of John when he was between four and six years old. *See supra* Part II. Failures to act, though inapplicable in addressing the affirmative act requirement, partially illustrate Moskowitz-Dodyk's conscience shocking behavior: she failed to ensure Coe was supervised on school grounds; she failed to expel Coe after he victimized a third student; and failed to instruct Sarah and Robert to monitor him.[5] *See supra* Part II.

The acts of Moskowitz-Dodyk included affirmative actions. Moskowitz-Dodyk allowed Coe to attend the TEC program, despite her knowledge of his criminal history of sexual abuse. *Id.* ¶ 27. Moskowitz-Dodyk—with knowledge of Philip's younger brothers—engaged the social

---

[5] Defendants cite 20 U.S.C. § 1232g and similar state laws barring disclosure of sensitive information. Those laws bar disclosure of tangible documents, not verbal information that relates to past criminal activity not contained in school records. *See* 20 U.S.C. § 1232g (a)(4)(A); M.G.L. c. 71, § 34D; 603 CMR 23.00. In any event, these laws likely would not have prevented Staff from telling Sarah and Robert that Coe required supervision at their home.

engineering that gave Coe access to John: she told Sarah and Robert that Philip would benefit from

a closer friendship with Coe; she encouraged Sarah and Robert to support a friendship between

the two, including spending time with one another outside of school and at the Doe home; she told

Sarah and Robert Coe was "a good kid;" she told Sarah and Robert that Coe was "good with kids;"

she begged Sarah to keep Philip in LVC and used Philip's friendship with Coe as leverage. *Id*. ¶¶

32-35, 49-50.

These acts resulted in the sexual abuse of John from the time he was four years old until

he reported the abuse at age six. *See supra* Part II. The affirmative social engineering of

Moskowitz-Dodyk aimed to keep students—even dangerous students such as Coe—in the TEC

program, to save money, regardless of the harm such social engineering would cause. These

actions and their motivations offend even hardened sensibilities and are offensive to human

dignity.

### b. DEFENDANT MOSKOWITZ-DODYK IS NOT ENTITLED TO QUALIFIED IMMUNITY.

At the time of Coe's sexual assault of John, a reasonable school official would have known

actions such as those of Moskowitz-Dodyk would have violated John's constitutional right to

bodily integrity. In considering qualified immunity, courts ". . . must decide (1) whether the facts

alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so,

whether the right was clearly established at the time of the defendant's alleged violation." *Rocket*

*Learning, Inc. v. Rivera-Sánchez*, 715 F.3d 1, 8 (1st Cir. 2013) (citations and quotations omitted).

As part of the second inquiry, courts consider whether a reasonable official would understand his

or her actions violates a right at the time of the violation in the specific context of the case. *Id*. at

9. "This is not to say that an official action is protected by qualified immunity unless the very

action in question has previously been held unlawful, but it is to say that in the light of pre-existing

law the unlawfulness must be apparent." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (citations omitted).

Courts have recognized the Due Process Clause's protection of the right to bodily integrity for well over fifty years. *See Washington v. Glucksberg*, 521 U.S. 702, 720 (citing *Rochin v. California*, 342 U.S. 165 (1952)). For the last thirty years, courts have recognized sexual abuse implicates this right to bodily integrity. *Armstrong v. Lamy*, 938 F. Supp. 1018, 1031 (D. Mass. 1996) (citing cases from several circuits). The First Circuit has recognized the state-created danger doctrine since 1997. *Frances-Colon v. Ramirez*, 107 F.3d 62, 63-64 (1997) (stating substantive due process 1983 claims for bodily integrity may only proceed if the government has taken the plaintiff into custody or the state-created danger doctrine applies).

In *Billingsley*, the defendant-teacher that issued a hall pass to the plaintiff-student's rapist—another student and known perpetrator of sexual abuse—was not entitled to qualified immunity. 2012 U.S. Dist. LEXIS 10074, at *19. First, case law had previously established her right to bodily integrity. *Id*. at *18-19 ((citing *Stoneking v. Bradford Area School District*, 882 F.2d 720, 726-27 (3d Cir. 1989), a case where a teacher molested students). Second, the Third Circuit's use of the state-created danger theory predated the action in question. *Id*. at *19.

Here, much like in *Billingsley*, Defendant Moskowitz-Dodyk's affirmative actions gave a known perpetrator of sexual abuse access to John. At the time of this sexual abuse, John's right to bodily integrity as well as his right to be free of Moskowitz-Dodyk's actions were clearly established at the time of the sexual abuse. Moskowitz-Dodyk is not entitled to qualified immunity.

## 2. TEC AND WAYLAND'S CUSTOM OF ENROLLMENT AND ACCEPTANCE OF TEC STUDENTS CAUSED THE DEPRIVATION OF JOHN'S CONSTITUTIONAL RIGHTS.

A plaintiff stating a Section 1983 claim against a municipal entity for deprivations of constitutional rights must show the deprivations resulted from municipal custom, policy, or practice. *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 694 (1978). For a valid *Monell* claim, the custom need not be approved through official decision making channels. *Los Angeles Cnty. v. Humphries*, 562 U.S. 29, 36 (2010) (citations and quotations omitted). *Respondeat superior* liability is not actionable through a *Monell* claim; in other words, a municipality will not be liable "'*solely* because it employs a tortfeasor.'" *Id.* (quoting *Monell*, 436 U.S. at 691) (emphasis in the original). Where the policy or custom inflicts the injury, claimants may assert *Monell* claims. *See id.* The municipality cannot claim a qualified immunity defense to its own constitutional violations. *Haley v. Boston*, 657 F.3d 39, 51 (1st Cir. 2011) (citations omitted).

In the present action, TEC and Wayland have maintained contracts to provide special education services to students in the Wayland area for over twenty years. Amend. Compl. ¶¶ 8-10, 19. These contracts created significant monetary incentives for retaining students in the TEC program, regardless of a student's educational needs or potential danger to other students. *Id.* ¶ 19; *see supra* Part II. To retain students in the program, they engaged in social engineering. *See* Amend. Compl. ¶¶ 32-34, 49-50. The facts illustrating this custom litter the Amended Complaint. TEC and Wayland admitted Coe into LVC despite knowledge of his previous acts of sexual abuse and retained him in the program after he abused another student on campus. *Id.* ¶¶ 24-27, 40, 43. TEC and Wayland begged Philip's parents to keep Philip in LVC and used their socially-

engineered friendship between Philip and Coe—a known perpetrator of sexual abuse—to keep Philip in LVC. *Id.* ¶¶ 49-50.

When TEC and Wayland learned of Coe's sexual abuse of John and harassment of Philip,[6] they refused to remove Coe from LVC or provide assurances for Philip's safety. *Id.* ¶¶ 70, 72, 78. Coe was only removed after Sarah's conversation with the superintendent. *Id.* ¶¶ 79-80. Prior to Coe's removal, he attended LVC for over two years despite known sexual misconduct conduct before enrollment and on school grounds during his time at TEC. *Id.* ¶¶ 24-27, 40, 43. At minimum, four staff members—two from TEC and two from Wayland—learned of Coe's latest instance of sexual abuse and refused to remove him from the LVC program. *Id.* ¶¶ 65-66, 70, 72, 78. These staff members included Wayland's high school principal and Moskowitz-Dodyk; both could have removed Coe from the program. *Id.* ¶¶ 15, 65. Years later, John struggled in high school, TEC and Wayland similarly used their authority to place John in a TEC program, rather than providing a placement that would address his PTSD. *See supra* Part II.

This behavior, by multiple staff members and over a period of nearly twenty-years, illustrates TEC and Wayland's custom of retaining students that are unfit for TEC programs and dangerous to others. To retain these students, TEC and Wayland declined to provide more appropriate educational placements and engaged in social engineering, which exposed students and their families to dangerous students, such as Coe. These practices caused John's constitutional injury: the deprivation of his right to bodily integrity.

In arguing TEC and Wayland's only custom was failing to supervise Coe, Defendants asked the Court to accept an "alternative to the [John's] theory;" however, John alleged sufficient

---

[6] At Wayland, Moskowitz-Dodyk and the Wayland High School Principal spoke with Sarah about the sexual abuse and harassment. Amend. Compl. ¶ 65. At TEC, Maxine Roberts and Dayna Hutchings spoke with Sarah about the sexual abuse and harassment. *Id.* ¶ 66.

facts to show this custom is plausible; TEC and Wayland should not prevail in their *Monell* argument. *See* Def. Mem. at 14; *Evergreen Partnering Group, Inc.*, 720 F.3d at 45 (quoting *Anderson News, L.L.C.*, 680 F.3d at 189).

### C. JOHN ALLEGES SUFFICIENT CLAIMS AGAINST WAYLAND AND TEC FOR TITLE IX VIOLATIONS.

20 U.S.C. Sections 1681 through 1686 ("Title IX") prohibits discrimination based on sex. The United States Supreme Court has recognized that this statute is broadly worded. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 179 (2005). "There is no doubt that 'if we are to give [Title IX] the scope that its origins dictate, we must accord it a sweep as broad as its language.'" *North Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 521 (1982) (quoting *United States v. Price*, 383 U.S. 787, 801 (1966)). Further, "[d]iscrimination is a term that covers a wide range of intentional unequal treatment; by using such a broad term, Congress gave the statute a broad reach." *Jackson*, 544 U.S. at 175 (citations and quotations omitted).

When proceeding with the hostile environment theory, in order for an educational institution to be held liable under Title IX, a plaintiff must prove: (1) the educational institution is the recipient of federal funding; (2) the institution acted with deliberate indifference; (3) to sexual harassment of which they had actual knowledge; (4) that is so severe, pervasive and objectively offensive as to deprive the victim of educational opportunities or benefits provided by the school. *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999).

Defendants TEC and Wayland argue John's claims fail because (1) Defendants conduct was not based on John's gender; and (2) Defendants were not deliberately indifferent to the harassment of John. Def. Mem. at 14-19. Defendants do not dispute that their conduct deprived John of educational opportunities or that they lacked actual knowledge of the sexual harassment.

As to Defendants' first argument, under Title IX, sexual abuse is sexual harassment based on gender. *See Franklin v. Gwinnett County Pub. Sch.*, 503 U.S. 60, 75 (1992) (extending the workplace definition of sexual harassment as discrimination based on gender to Title IX claims in school settings); *see Porto v. Town of Tewksbury*, 488 F.3d 67, 74-75 (1st Cir. Mass. 2007) (sexual activity between students considered sexual harassment based on gender under Title IX). The sexual harassment need not occur on school grounds to lead to Title IX liability. *See Simpson v. University of Colorado Boulder*, 500 F.3d 1170, 1173, 1185 (10th Cir. 2007) (denying defendants' summary judgement motion on a Title IX claim where the sexual assault occurred off campus).

Coe was a student of LVC, which was administered and operated by Wayland and TEC. Amend. Compl. ¶¶ 20, 23. Coe sexually abused John—harassment based on gender under Title IX—over a two year period. *Id.* ¶¶ 45, 56, 58. At least three of these assaults occurred after John enrolled in Wayland Public Schools. *Id.* ¶ 56. John's claim meets the gender requirement for his Title IX hostile environment claim.

As to Defendants' second argument, when considering deliberate indifference, administrators are deemed deliberately indifferent when ". . . the recipient's response to harassment or lack thereof is clearly unreasonable in light of known circumstances." *Davis*, 526 U.S. at 648. According to the First Circuit, "[A] claim that the school system could or should have done more is insufficient to establish deliberate indifference." *Porto v. Town of Tewksbury*, 488 F.3d 67, 73 (1st Cir. Mass. 2007). Inaction or failure to take additional measures after initial efforts fail, however, gives rise to deliberate indifference. *Id.* at 74. Where school officials ignore past sexual harassment and its effect on their students, they are deliberately indifferent under Title IX. *See H.B. v. State Bd. of Educ.*, No. 4:14-CV-204-BO, 2015 U.S. Dist. LEXIS 61289, at *15

(E.D.N.C. May 8, 2015) (denying a school's motion to dismiss a Title IX claim where the school dismissed the student's allegations of rape and did not provide medical treatment).

Defendants omitted and misstated facts in their discussion of this element. While Defendants correctly stated Sarah's request led to Coe's removal from LVC, they omitted that Sarah spoke with five staff members of varying levels of authority, including the principal of Wayland High School, before the superintendent of Wayland Public Schools agreed to remove Coe. Amend. Compl. ¶¶ 65-80. Additionally, Defendants implied John suffered from a serious drug problem when they stated, "When plaintiff's mother complained about her son's lack of treatment for PTSD, school officials explained that John's academic problems were related to drug use." Def. Mem. at 19 (citing Amend. Compl. ¶¶ 108-09). As the facts reflect, Defendants alleged John smoked marijuana even though John's only discipline problems at school related to absences caused by PTSD symptoms.[7] Amend. Compl. ¶¶ 108-10.

Coe's sexual abuse of John caused John's PTSD. *Id.* ¶¶ 83-84. Defendants failure to provide any therapy or acknowledge John's PTSD diagnosis—despite verbal notice of the past sexual abuse; personal knowledge of the past sexual abuse; written notice of John's PTSD diagnosis; and numerous requests from John's parents—from 2009 until March of 2013 best illustrate Defendants' deliberate indifference. *Id.* ¶¶ 91-125. During this period, John's academic performance remained stagnant or declined. *Id.* ¶¶ 91, 95, 100. Defendants did not provide therapy

---

[7] This accusation gives rise to a Title IX claim for retaliation. For such a claim, John must allege that he engaged in conduct protected by Title IX, Defendants took adverse action against him, and there is a casual link between the two. *Frazer v. Temple Univ.*, 25 F.Supp.3d 598, 615 (E.D. Pa. 2014) (citations omitted). "To establish the requisite causal connection, Plaintiff must allege facts to demonstrate either: "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Id.* (citations omitted). John attempted to receive therapy for PTSD caused by sexual abuse over the course of several years. Amend. Compl. ¶¶ 91-127. Defendants refused. *Id.* At a meeting, Sarah stated she felt her family was being victim blamed for reporting Coe and having him removed from school. *Id.* ¶ 120. The tone of the meeting changed; Moskowitz-Dodyk yelled at John and accused John of disrespecting his treatment team for refusing to attend drug treatment. *Id.* ¶¶ 122-25.

or allow John to attend a therapeutic school until an education lawyer intervened in early 2013. *Id*. ¶ 127.  Once John received therapy, his grades improved.  *Id*. ¶ 130.  In 2014, testing revealed John likely never suffered from a communications disability as Defendants claimed.  *Id*. ¶¶ 97, 132.  For four years, John's struggled academically because of the PTSD caused by the sexual abuse of another student; for four years the Defendants refused to acknowledge or in any way address John's PTSD symptoms.  Defendants' initial measures to address the harassment by Coe failed, and their refusal to take any further measures amounted to deliberate indifference.

## IV. CONCLUSION

The issue when considering a motion to dismiss "'is not whether there is a plausible alternative to the plaintiff's theory; the question is whether there are sufficient factual allegations to make the complaint's claim plausible.'" *Evergreen Partnering Group, Inc.*, 720 F.3d at 45 (quoting *Anderson News, L.L.C.*, 680 F.3d at 189).  John made sufficient factual allegations in the Amended Complaint for his claims to survive Defendants' Motion to Dismiss.

## REQUEST FOR ORAL ARGUMENT

Plaintiff respectfully requests oral argument.


The Plaintiff, by his Attorneys,


/s/ Sara Elizabeth Burns
Sara Elizabeth Burns, Esq. (BBO # 692115)
Law Office of Sara Elizabeth Burns
175 Federal Street, Suite 1425
Boston, MA 02110-2287
617-767-2710 / sara@seburnslaw.com

/s/ Carmen L. Durso
Carmen L. Durso, Esq., (BBO #139340)
Law Office of Carmen L. Durso
175 Federal Street, Suite 1425
Boston, MA 02110-2287
617-728-9123 / carmen@dursolaw.com
October 19, 2015

**CERTIFICATE OF SERVICE**

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing, and paper copies will be sent to those indicated as non-registered participants on October 19, 2015.

/s/ Sara Elizabeth Burns
Sara Elizabeth Burns, Esq.