UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ——————————————— ) | |
| JOHN DOE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| TOWN OF WAYLAND, ) | Civil No. 15-13250-LTS |
| THE EDUCATION COOPERATIVE, ) | |
| MARLENE MOSKOWITZ-DODYK, ) | |
| MARY MOES 1-5, and MICHAEL ) | |
| MOES 1-5 ) | |
| ) | |
| Defendant(s). ) | |
| ——————————————— ) | |

MEMORANDUM AND ORDER ON MOTION TO
DISMISS FOR FAILURE TO STATE A CLAIM (DOC. NO. 9)

April 13, 2016

SOROKIN, J.

Plaintiff John Doe ("John") brings this action against Defendants Town of Wayland

("Wayland"), The Education Cooperative ("TEC"), Marlene Moskowitz-Dodyk ("Moskowitz-

Dodyk"), Mary Moes 1-5 ("Mary Moes"), and Michael Moes 1-5 ("Michael Moes") (collectively

"Defendants").[1]  Doc. No. 7 at 14-43.  The allegations center around Defendants' role in, and

response to, sexual abuse John suffered at the hands of another individual, Christopher Coe

("Coe").  See id.  After John filed the operative Amended Complaint in Middlesex County

---

[1] Because Doe has yet to serve either the Mary Moes or the Michael Moes, see Doc. No. 7, the
Court also uses the terms "Served Defendants" or "Defendants" to refer to Wayland, TEC, and
Moskowitz-Dodyk collectively.

Superior Court, Wayland, TEC, and Moskowitz-Dodyk removed the case to this Court.[2]  Doc.

No. 1.  Those Defendants then moved to dismiss for failure to state a claim.  Doc. No. 9.  John

opposed the motion, Doc. No. 13, and the Court held a hearing on the motion.  See Doc. No. 16.

After careful consideration of the parties' briefs and arguments, the motion is ALLOWED IN

PART and DENIED IN PART.

I.      FACTS[3]

        A.      Background

        TEC, which consists of several school districts, "is an educational collaborative"

established under Massachusetts Law.  Doc. No. 7 ¶ 4.[4]  It "was formed to provide services,

including special education services, to member districts and the education community as a

whole."  Id. ¶ 8.  During this time, Moskowitz-Dodyk was a Wayland Public Schools

administrator.  Id. ¶ 6.  She held several roles "related to special education and guidance,

including Out of District Coordinator," id. ¶ 14, and she "had decision-making power in the

Individualized Education Program (IEP) of each child at Wayland High School and authority to

decide which students attended the TEC program."  Id. ¶ 15.  The Mary Moes and Michael Moes

were additional employees of either Wayland or TEC.  Id. ¶ 18.

        TEC and Wayland had a contract with each other, whereby TEC provided programming

and personnel at multiple Wayland Public Schools, including Claypit Hill Elementary School

---

[2] Because only "all defendants who have been properly joined and served must join in or consent to the removal of the action," see 28 U.S.C. § 1446(b)(2)(A), the Mary Moes' and Michael Moes' consent was not necessary.

[3] Given the motion to dismiss posture, the Court "recite[s] the facts as alleged in the complaints and documents incorporated therein by reference."  Lister v. Bank of America, N.A., 790 F.3d 20, 22 (1st Cir. 2015).

[4] Doc. No. 7 is the State Court record.  Citations to Doc. No. 7 are to specific paragraphs in the Amended Complaint, found within pages 14-43.

and Wayland High School.  Id. ¶¶ 9, 10, 13.  "The contract calculated rates for services based on the type of programming, minimum number of students in a particular program, and required payments beyond the termination date if a student terminated his or her participation in TEC programming."  Id. ¶ 19.  If a particular student withdrew from TEC programming, Wayland would still owe TEC money for a portion of the un-provided services.  See id. ¶ 41. Wayland would also need to pay for a new placement, even if more expensive, for any student who left a TEC program.  See id. ¶ 53.  If a certain amount of students withdrew from TEC's programming, Wayland would incur a higher rate for remaining students.  Id. ¶ 42.

In 1995, when he was fifteen years old, Coe sexually abused two boys.  Id. ¶ 24.  The next year, Coe enrolled as a student at TEC's Learning and Vocational Center ("LVC") program, which TEC had set up at Wayland High, in 1996.  Id. ¶¶ 20, 25.  When he enrolled, Coe was on probation for the prior sexual abuses.  Id. ¶ 25.  Staff for Wayland and TEC, including Moskowitz-Dodyk (collectively "Staff"), "were aware of Coe's history of sexually abusing children."  Id. ¶ 27.  Accordingly, they "instituted a policy that required employees to supervise Coe at all times."  Id. ¶ 28.  On at least two occasions between 1998 and 1999, Coe sexually abused, on school grounds, "a female student with a developmental disability" named Rachel Roe ("Rachel").  Id. ¶ 39.  After discovering this abuse, Staff "failed to notify any parents, include [sic] the victim's parents, and did not remove Coe from TEC's LVC program or alter their supervision of Coe."  Id. ¶ 40.

B.    The Coe-Philip Friendship

While at LVC, Coe met John's older brother, Philip.  Id. ¶ 29; see ¶ 21 (identifying Philip as John's older brother).  "Staff actively encouraged the friendship between Coe and Philip."  Id. ¶ 30.  This encouragement manifested itself in meetings various Staff members, including

Moskowitz-Dodyk, held with John's parents, Sarah and Robert.  Id. ¶¶ 31, 32.  Staff, including Moskowitz-Dodyk, asserted at these meetings that Philip "would benefit from a closer friendship with Coe."  Id. ¶ 32.  Staff, including Moskowitz-Dodyk, recommended that Philip and Coe "spend[] time with one another outside of school and at the Doe home," id. ¶ 33, and described Coe as "both 'a good kid' and 'good with kids.'"  Id. ¶ 34.  Staff, including Moskowitz-Dodyk, knew about Philip's young siblings, including John, yet they neither informed Sarah and Robert about Coe's sexual misconduct with children, id. ¶ 35, nor recommended any supervision when Coe was either with Philip or at the Doe home.  Id. ¶ 36.  When Philip's parents considered moving Philip to a different program, Moskowitz-Dodyk, contending that "Philip's friendship with Coe was important and removing Philip would end this friendship," implored them to keep him at LVC.  Id. ¶¶ 49, 50.

      C.    <u>Coe's Abuse</u>

Staff, including Moskowitz-Dodyk, knew that based off their encouragement, "Sarah and Robert allowed Coe to spend time at their home."  Id. ¶ 37.  This encouragement continued even after Staff learned about Coe's sexual abuse of Rachel.  Id. ¶ 43.  In 1998, shortly after he began sexually abusing Rachel, Coe began sexually abusing John.  Id. ¶ 44, 45.  John was then four years old.  Id. ¶ 45.  Coe abused John on multiple occasions, the majority of which "occurred at the Doe home when Coe visited Philip."  Id. ¶ 46.  At least three instances of abuse occurred after the fall of 1999, when John began kindergarten at Claypit Hill.  Id. ¶¶ 55-56.  "Acts of sexual abuse included masturbation and penis to buttocks contact."  Id. ¶ 57.  "The abuse only ended after six-year-old John reported the abuse to a family friend who alerted John's family on July 26, 2000."  Id. ¶ 58.  Upon hearing this, Sarah immediately went to the Wayland Police Department, id. ¶ 59, and on May 22, 2001, Coe pled guilty in Framingham District Court to

four counts of Indecent Assault and Battery on a Child Under 14.  Id. ¶ 60.  He received a

sentence of four years of probation, and had to register as a level two sex offender.  Id. ¶ 61.

From July 2000 (when Sarah reported Coe's abuse) until April 2001, Coe, along with his

brother and friends, "harassed, threatened, and bullied" the Does.  Id. ¶ 62.  John had knowledge

of this.  Id. ¶ 63.  In the summer of 2000, Coe, "stating that he would 'turn Philip into a locker

stiff,'" threatened Philip's life.  Id. ¶ 64.

D.     Initial Responses

Sarah, fearing for her family's safety, contacted several school personnel.  Id. ¶ 65.  She

first spoke with Maxine Roberts ("Roberts") and Dayna Hutchings, both TEC employees.  Id.

¶ 66.  Roberts knew about Coe's other victims.  Id. ¶ 67.  Sarah told them about Coe's abuse of

John and the threats to her family, and she "asked that they remove Coe from the TEC program."

Id. ¶¶ 68, 69.  TEC neither removed Coe nor offered assurances of protection for Philip.  Id. ¶ 70.

Sarah next told Moskowitz-Dodyk about Coe's threats, id. ¶ 71, and she too "refused to

remove Coe or provide assurances for Philip's safety."  Id. ¶ 72.  When Sarah expressed

particular concern about Coe remaining at LVC because the program resided in the same

building as a preschool, id. ¶ 73, "Moskowitz-Dodyk told Sarah not to talk about Coe's abuse of

children because it was unfair to John."  Id. ¶ 75.

Sarah subsequently escalated her complaints of Coe's abuse of John and threats to her

family to the Wayland High principal, id. ¶ 77, who "also refused to remove Coe or offer

assurances for Philip's safety despite notice and knowledge of Coe's sexual abuse of children."

Id. ¶ 78.  Finally, in September 2000, Sarah spoke with Gary Burton, Superintendent of Wayland

Public Schools, id. ¶ 79, and after this discussion, Coe was removed from LVC.  Id. ¶ 80.

During this time, a Wayland High employee who worked with special education students "told

Sarah that Staff knew about Coe's history of abusing children, Coe abused Rachel on school grounds, and that Staff were not permitted to discuss Coe's abuse of children with anyone, including Rachel's parents, who were unaware of the sexual abuse of their daughter." Id. ¶ 81. Shortly after that conversation, that employee lost her job. Id. ¶ 82.

     E.    Subsequent Responses

John began receiving therapy in July 2000. Id. ¶ 83. John's therapist diagnosed him with Post-Traumatic Stress Disorder ("PTSD"), stemming from Coe's abuse. Id. ¶¶ 83-84. John's symptoms included "refus[ing] to sleep alone, suffer[ing] from nightmares, and beg[innig to] wet[] the bed." Id. ¶ 85. John's therapist also told Sarah and Robert that "there were more instances of abuse than John indicated to his family and police." Id. ¶ 86.

Sarah told Claypit Hill about John's PTSD diagnosis, and Claypit Hill informed her it would keep this diagnosis in John's file, which would last throughout his time at Wayland Public Schools. Id. ¶ 87. In or around 2006, John, now in middle school, both showed signs of depression and experienced a decline in his academic performance., id. ¶¶ 89-90, and by the time he began at Wayland High School as a ninth-grader in 2009, "[h]e could not concentrate and started to fail classes." Id. ¶ 91.

Sarah and Robert subsequently spoke with John's guidance counselor. Id. ¶ 92. The guidance counselor informed them that "school staff did not know about John's PTSD diagnosis," id., and recommended establishing an Individualized Education Plan ("IEP") for John. Id. ¶ 93. Sarah and Robert had a meeting to set up an IEP with Staff, including Moskowitz-Dodyk. See id. ¶ 96. They brought a copy of John's PTSD diagnosis to this meeting, id. ¶ 94, and explained that PTSD inhibited John's focus at school. Id. ¶ 95. Staff, including Moskowitz-Dodyk, resisted John's PTSD diagnosis at this meeting, and declared a

need to test him.  Id. ¶ 96.  At another meeting held after the testing, Staff, including Moskowitz-Dodyk, rejected the PTSD diagnosis, instead stating that John had a communication problem.  Id. ¶ 97.  They refused to include any mention of PTSD in John's IEP.  Id. ¶ 99.

By fall of 2010, John had not improved, and so "Staff, including Moskowitz-Dodyk, informed Sarah and Robert they needed to send John to the TEC program in Newton, Massachusetts."  Id. ¶ 100.  Sarah and Robert opposed this, noting that Coe himself was a TEC student when he abused John.  Id. ¶ 101.  Instead, they wanted to send John to a therapeutic school for treatment and academic support for his PTSD.  Id.  Staff refused this suggestion, instead sending John to the TEC program, but promising that he would begin therapy immediately thereafter.  Id. ¶ 102.  John did not receive the therapy, however, id. ¶ 103, and, in response to inquiries from Sarah, the school said that the need for therapy had to "be written into John's IEP."  Id. ¶ 104.

Sarah had another meeting in winter 2011.  Id. ¶ 107.  She addressed John's lack of treatment, and Staff, including Moskowitz-Dodyk, informed her that "they did not believe John suffered from PTSD, but alleged he smoked marijuana."  Id. ¶ 108.  Even though John had no discipline problems at school from drug use, id. ¶ 110—his only behavior problems at school "were absences due to PTSD symptoms," id. ¶ 111—Staff insisted that marijuana use caused John's academic troubles.  Id. ¶ 109.  While Staff agreed to include a summary of Coe's sexual abuse in John's IEP, they still would not add the PTSD diagnosis.  Id. ¶ 112.  The summary, making no reference to PTSD or any impact on John's academic performance, only described the perpetrator as a "non-family member."  Id. ¶ 113.  While John was at TEC in Newton, Sarah unsuccessfully requested that the school provide John PTSD therapy.  Id. ¶ 114.

Staff, including Moskowitz-Dodyk, held an IEP meeting with Sarah and Robert in early 2013. Id. ¶ 115. At this meeting, they informed Sarah and Robert that John would not graduate, id., and could only remain in school "if he attended a drug program of their choice." Id. ¶ 116. Staff continued to insist that drug abuse, and not Coe's sexual abuse, was causing John's troubles. Id. ¶ 117. John refused to enter a drug program, and TEC suspended him immediately thereafter. Id. ¶ 118.

Sarah, Robert, and John held a meeting a few days later with Moskowitz-Dodyk, Student Services Coordinator Ilene Lieberman, and Guidance Counselor Marybeth Sacramone. Id. ¶ 119. They rejected Sarah's request to send John to a therapeutic school, id. ¶¶ 120-22, instead saying "[h]is only options were to attend a school similar to his present school, receive tutoring, or obtain his GED." Id. ¶ 122. At this meeting, Moskowitz-Dodyk also yelled at John while informing him he couldn't graduate, id. ¶ 124, and told him that he "had no respect for his treatment team for refusing the drug treatment program." Id. ¶ 125.

After this meeting, Sarah contacted an education lawyer, who intervened on her behalf. Id. ¶ 126. After this intervention, in March 2013, John enrolled at Dearborn Academy, where he began receiving therapy. Id. ¶¶ 127-28. John's grades improved at Dearborn Academy. Id. ¶ 130. His "therapist observed his avoidance strategies and their relationship with the childhood sexual abuse," id. ¶ 129, and concluded, after testing, "that John likely never suffered from a communications disability." Id. ¶ 132. Staff at both Wayland and TEC refused to change their diagnosis of John, even after he enrolled at Dearborn Academy. Id. ¶ 131.

II.     LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a Complaint must contain sufficient factual matter, accepted as true, to "state a claim

to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell

Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  The Court "must take the allegations in the

complaint as true and must make all reasonable inferences in favor of the plaintiff[]." Watterson

v. Page, 987 F.2d 1, 3 (1st Cir. 1993).  "[F]actual allegations" must be separated from

"conclusory statements in order to analyze whether the former, if taken as true, set forth a

plausible, not merely a conceivable, case for relief." Juarez v. Select Portfolio Servicing, Inc.,

708 F.3d 269, 276 (1st Cir. 2013) (internal quotations omitted).  This "highly deferential"

standard of review "does not mean, however, that a court must (or should) accept every

allegation made by the complainant, no matter how conclusory or generalized." United States v.

AVX Corp., 962 F.2d 108, 115 (1st Cir. 1992).  Dismissal for failure to state a claim is

appropriate when the pleadings fail to set forth "factual allegations, either direct or inferential,

respecting each material element necessary to sustain recovery under some actionable legal

theory." Berner v. Delahanty, 129 F.3d 20, 25 (1st Cir. 1997) (quoting Gooley v. Mobil Oil

Corp., 851 F.2d 513, 515 (1st Cir. 1988)).

While the Court typically "may not consider any documents that are outside of the

complaint, or not expressly incorporated therein, unless the motion is converted into one for

summary judgment," Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co., 267 F. 3d 30, 33 (1st

Cir. 2001),  there is an exception "for documents the authenticity of which are not disputed by

the parties; for official public records; for documents central to plaintiffs' claim; or for

documents sufficiently referred to in the complaint." Watterson, 987 F.2d at 3.

III.    DISCUSSION

John asserts five claims for relief.  He brings three claims under 42 U.S.C. § 1983,

asserting that Moskowitz-Dodyk, Wayland, and TEC each violated his substantive due process

rights.  See Doc. No. 7 ¶¶ 134, 135, 136.  He also asserts claims against Wayland and TEC for

violating his rights under 20 U.S.C. § 1681 ("Title IX").  See Doc. No. 7 ¶¶ 156, 158.  He asserts

two different theories for recovery under Title IX against each defendant—both that they

"retaliated against John for pursuing his rights under Title IX," id. ¶¶ 141, 147; and that they

"subjected [him] to harassment based on his gender."  Id. ¶¶ 142, 148.  The Court addresses each

of these claims in turn.

      A.         § 1983 Substantive Due Process Claims (Counts I, II, and III)

"[T]o state a claim under § 1983, a plaintiff must allege (1) the violation of a right

protected by the Constitution or laws of the United States and (2) that the perpetrator of the

violation was acting under color of law."  Cruz-Erazo v. Rivera-Montanez, 212 F.3d 617, 621

(1st Cir. 2000).  Defendants do not dispute that they acted under color of law.  Rather, the parties

clash over whether any of the Defendants violated John's constitutional rights.

John's Complaint alleges violation of "his substantive due process right to bodily

integrity."  Doc. No. 7 ¶ 134-36.  Importantly, Coe, and not any of the named defendants, was

John's abuser.  Because Coe's status as a private individual adds an additional dimension to the

analysis, the Court begins its discussion of John's § 1983 claims with an overview of this area of

law.

The Fourteenth Amendment's Due Process Clause protects "more than fair process, and

the 'liberty' it protects includes more than the absence of physical restraints."  Washington v.

Glucksberg, 521 U.S. 702, 719 (1997).[5]  Specifically, this substantive component "provides

heightened protection against government interference with certain fundamental rights and

---

[5] The Fourteenth Amendment reads, in relevant part: "No State shall . . . deprive any person of
life, liberty, or property, without due process of law."  U.S. const. amend. XIV, § 1.

liberty interests," including a right "to bodily integrity." <u>Id.</u> at 720.  However, this right contains important limitations.

As the Supreme Court recognized in <u>DeShaney v. Winnebago Cty. Dept. of Soc. Servs.</u>, 489 U.S. 189, 195 (1989), "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." While the State may not "deprive individuals of life, liberty, or property without 'due process of law,' . . . its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means." <u>Id.</u>  <u>Deshaney</u> involved "'undeniably tragic' facts: Local child-protection officials had failed to protect a young boy from beatings <u>by his father</u> that left him severely brain damaged." <u>Town of Castle Rock v. Gonzales</u>, 545 U.S. 748, 755 (2005) (citing <u>Deshaney</u>, 489 U.S. at 191-93) (emphasis added). Nevertheless, the Court held that "[b]ecause . . . the State had no constitutional duty to protect Joshua against his father's violence, its failure to do so—though calamitous in hindsight—simply d[id] not constitute a violation of the Due Process Clause." <u>Deshaney</u>, 489 U.S. at 202.

<u>DeShaney</u> did not entirely absolve government officials from liability for harm a private actor inflicts. <u>See</u> <u>Rivera v. Rhode Island</u>, 402 F.3d 27, 34 (1st Cir. 2005).  One source of liability is when the government has a "special relationship" with an individual, such that "an affirmative, constitutional duty to protect may arise when the state 'so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs.'" <u>Id.</u> (quoting <u>DeShaney</u>, 489 U.S. at 200).  <u>DeShaney</u> alluded to a second avenue as well, "that when the state creates the danger to an individual, an affirmative duty to protect might arise." <u>Id.</u> at 34-35; <u>see</u> <u>DeShaney</u>, 489 U.S. at 201 ("While the State may have been aware of the dangers that Joshua faced in the free world, <u>it played no part in their creation,</u>

nor did it do anything to render him any more vulnerable to them.") (emphasis added).  John's claims rely on this state-created danger theory.  See Doc. No. 13 at 13, 15-16.[6]

To prevail on a state-created danger claim, John must prove not only that a government official's action proximately caused his injuries, but also that these actions shock the court's conscience.  Lockhart-Bembery v. Sauro, 498 F.3d 69, 77 (1st Cir. 2007).  "The burden to show state action that shocks the conscience is extremely high, requiring stunning evidence of arbitrariness and caprice that extends beyond mere violations of state law, even resulting from bad faith to something more egregious and more extreme."  Melendez-Garcia v. Sanchez, 629 F.3d 25, 37 (1st Cir. 2010) (internal quotation marks omitted).  "In order to 'shock the contemporary conscience,' state action must be 'egregious' and 'outrageous.'"  Id. (quoting Rivera, 402 F.3d at 36); see also Collins v. City of Harker Heights, 503 U.S. 115, 128 (1992) (observing that the Supreme Court has "previously rejected claims that the Due Process Clause should be interpreted to impose federal duties that are analogous to those traditionally imposed by state tort law").  However, "whether behavior is conscience shocking varies with regard to the circumstances of the case.  In situations where actors have an opportunity to reflect and make reasoned and rational decisions, deliberately indifferent behavior may suffice to 'shock the conscience.'"  Rivera, 402 F.3d at 36.[7]

---

[6] While the First Circuit has never held that a plaintiff has successfully made out a state-created danger claim, it has on multiple occasions—as discussed below—offered support for the cognizability of the state-created danger theory.

[7] Defendants cite Cty. of Sacramento v. Lewis, 523 U.S. 833 (1998) for the proposition that "[c]onscience-shocking behavior means more than negligence, recklessness or even deliberate indifference."  Doc. No. 10 at 9.  However, this reads Lewis too narrowly—Rivera's discussion of deliberate indifference derives directly from Lewis's observation that "markedly different circumstances . . . show[] why the deliberate indifference that shocks in the one case is less egregious in the other."  532 U.S. at 851 (internal citations omitted); accord Mongeau v. City of Marlborough, 492 F.3d 14, 18 (1st Cir. 2007) ("We have never precluded a plaintiff from arguing that conduct that is the product of a deliberate and premeditated decision might be

In J.R. v. Gloria, 593 F.3d 73, 80 (2010), the First Circuit, analyzing whether social workers' failure to prevent plaintiffs from suffering harm in their foster homes shocked the conscience, used the following test: "state officials must have been at least aware of known or likely injuries or abuse and have chosen to ignore the danger to the child."  Because, just as the J.R. defendants "were [not] responding to an emergency, with no time to reflect," id., Defendants in this case did not face a pressurized environment requiring decisive action, the Court analyzes John's claims under the same framework.

Given the procedural posture, the Court takes as true John's allegations that Defendants: knew that Coe had sexually abused multiple children, including young boys; made sure to supervise Coe when he was at school; repeatedly encouraged Philip to form a friendship with Coe; knew that Philip lived with a younger brother, John; encouraged Philip's friendship with Coe to include Coe visiting the Doe household outside of school; specifically told Sarah and Robert that Coe was "good with kids" and "a good kid";[8] did not inform John's parents that Coe required supervision, let alone that Coe had sexually abused young boys; did not inform the Does about Coe's subsequent abuse of Rachel; specifically cited Philip's friendship with Coe, and the importance of preserving it, as a reason to keep Philip enrolled with LVC; did not terminate Coe's enrollment in TEC even after his abuse of Rachel; and undertook all these actions for the purpose of saving money on their contracts with TEC.  If true, these actions are not laudatory.

---

conscience-shocking, whereas the same conduct might not be if it was undertaken in the heat of the moment.  Ultimately such an argument would not affect our conclusion that only conscience-shocking behavior will constitute a substantive due process violation.").

[8] These affirmative acts, taken with knowledge of Coe's history and the practice of placing Coe under constant supervision at school, dispels Defendants' argument that John has built his case solely on omissions of the defendants.

Indeed, such conduct may even violate state tort law.  Whether or not John can demonstrate a violation of his <u>constitutional</u> rights, however, poses a different question.

Defendants' alleged actions unambiguously left John more vulnerable than if they had never acted.  <u>Cf.</u> <u>Deshaney</u>, 489 U.S. at 201 ("While the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them.").  Without their encouragement, the Court can reasonably infer, Coe and Philip would not have formed as close a friendship as they had, resulting in Coe visiting the Doe's home and molesting John.  Further, had Defendants not emphasized Coe's friendship with Philips in dissuading the Doe's from removing Philip from LVC, the Court can reasonably infer that Coe would have had less opportunities to abuse John.  The closer question is whether these actions shock the conscience of the Court.

The appellate case most similar to this one is <u>Armijo v. Wagon Mound Pub. Schs.</u>, 159 F.3d 1253 (10th Cir. 1998).  The First Circuit has described <u>Armijo's</u> facts thusly:

> [S]chool officials sent home a 16-year-old special education student for violent behavior at school.  The student had earlier threatened to kill himself, and contrary to school policy, the officials did not notify his parents that he had been sent home, where the student had access to firearms—a fact school officials were alleged to have known.  Alone at home, the student shot himself.

<u>Hasenfus v. LaJeunesse</u>, 175 F.3d 68, 73-74 (1st Cir. 1999).  The Tenth Circuit affirmed a denial of summary judgment on that factual record, noting that the relevant defendants increased the risk of danger Armijo, the student, faced, "acted recklessly in conscious disregard of the risk of suicide," and that such conduct could (given what a full trial might reveal) shock the conscience.  <u>See</u> <u>Armijo</u>, 159 F.3d at 1264.

Were <u>Armijo</u> binding authority, the Court would have little trouble concluding that John has plausibly stated a claim for violation of his constitutional rights.  Just as <u>Armijo</u> featured

14

defendant school entities who knew of both a specific risk—Armijo's suicidal thoughts—and specific factors that aggravated that risk—firearms in the home and a lack of supervision over Armijo in the immediate aftermath an upsetting interaction (his suspension)—so too does this case.  Defendants, including Moskowitz-Dodyk, knew of Coe's history of sexually abusing children, including young boys.  They also knew that John, someone similar to some of Coe's previous victims, lived at the Doe house.  Yet just as the <u>Armijo</u> defendants nevertheless affirmatively placed Armijo, alone, in a vulnerable situation, so too did these Defendants place John in a vulnerable situation.  By working to ensure Coe's presence in the Doe home without informing Sarah and Rachel about the inherent risks of doing so, they exposed John to Coe's sexual abuse.

If anything, distinctions between <u>Armijo</u> and here render this case more conscience-shocking.  Admittedly, <u>Armijo</u> was home alone, with nobody else to intervene to protect him, while Sarah, Rachel, and/or Philip potentially were present with Coe in the Doe household.  However, unlike <u>Armijo</u>, which involved a single (albeit ultimately fatal) instance of misconduct, the Defendants here allegedly repeatedly encouraged the development, and maintenance, of Coe's friendship with Robert, including via specific representations that Coe was "good with kids."  These Defendants also had enough concern about Coe's behavior to require supervision over him anytime he was at school, a concern they failed to share with Sarah and Robert.[9]  Further, even if one can excuse Defendants' failure to inform the Does about Coe's prior instances of sexual abuse, on the theory that it took place in the past, <u>but c.f.</u> <u>Smith v. Doe</u>,

---

[9] To be clear, Defendants had no obligation to affirmatively share their concerns about Coe with Sarah and Robert.  However, the fact that they themselves had concerns about Coe, yet still remained silent, helps render conscience-shocking the affirmative acts they undertook in encouraging Coe's friendship with Philip and asserting that Coe was "good with kids.".

538 U.S. 84, 103 (2003) ("The risk of recidivism posed by sex offenders is 'frightening and high.'") (quoting McKune v. Lile, 536 U.S. 24, 34 (2002)), their continued encouragement of Philip's friendship with Coe, even after learning of Coe's abuse of Rachel, is another matter entirely.

And finally, the alleged motivation which prompted the two sets of Defendants to engage in their respective conduct is more egregious here.  The principal in Armijo "immediately suspended Armijo on an emergency basis" when, after reprimanding Armijo for harassing an elementary student, Armijo, in her presence, "threatened physical harm to the teacher that reported the incident, to the teacher's son, and to the teacher's car." Armijo, 159 F.3d at 1256-57.  Unlike the potential safety threat which drove the Armijo defendants to send Armijo home, financial considerations, per the Complaint, motivated the Defendants here to encourage the Coe-Philip friendship.  And repeatedly prioritizing fiscal concerns over a known, not-insignificant risk of sexual abuse of a child shocks this Court's conscience.

Of course, Armijo is persuasive—not binding—authority on this Court.  In Hasenfus, the First Circuit, reviewing a motion to dismiss, examined Armijo in the course of rejecting a state-created danger claim.  See 175 F.3d at 73-74.  Hasenfus involved a gym teacher who reprimanded a fourteen-year-old female student, Jamie Hasenfus ("Jamie"), for misbehaving during class.  Id. at 69.  The gym teacher sent her to the locker room where, unsupervised, she tried to hang herself.  Id. at 70.  Jamie was raped—and had testified against her rapist—roughly a year before the attempted suicide, and school officials allegedly knew about this.  Id.  The Hasenfus Complaint claimed that the gym teacher "knew or should have known of the rape and should not have sent Jamie 'alone and unsupervised away from the area he was monitoring when he knew or should reasonably have known that she was despondent or distressed.'"  Id.  Finally,

16

the Complaint alleged that "seven other students . . . had also attempted suicide in the three

months prior," and that "Jamie apparently knew or was associated with at least two of those

students." Id.

After discussing Armijo's facts and holding, the First Circuit, while not opining on the

correctness of the Tenth Circuit's decision, characterized Armijo's facts as "at least very

troubling, especially as to any participating official who knew of both the suicide threat and the

available gun." Id. at 74 (emphasis added).  "Even so," it added, "the facts in that case go a step

beyond the typical endangerment cases cited by the Tenth Circuit, cases that involve manifestly

outrageous behavior by the authorities certain to cause harm." Id. (internal citations omitted).[10]

Finally, the First Circuit had no trouble distinguishing Armijo's facts from the less-troublesome

facts then before it.  See id. ("If sound, the Tenth Circuit decision is at the outer limit, and does

not come close to embracing [the Hasenfus defendant's] actions.").

This Court does not read Hasenfus's analysis of Armijo to preclude finding that

Defendants here violated John's constitutional rights.  First, Hasenfus distinguishes Armijo on

the grounds that Armijo featured more severe misconduct.  Second, although Hasenfus did not

specifically agree with Armijo, it acknowledged that Armijo may represent "the outer limit" of

substantive due process, see id., and, as discussed above, John's allegations are, if anything, even

more conscience-shocking.  And finally, yet most importantly, John's allegations shoehorn into

exactly the aspect of Armijo which most troubled the Hasenfus Court—school officials'

awareness of a specific risk (suicide for Armijo, sexual abuse for John), and a specific factor

---

[10] Hasenfus specifically cited to Dwares v. City of New York, 985 F.2d 94, 96 (2d Cir. 1993)
(police encouraging skinheads to beat up flag-burning demonstrators), and Ross v. United States,
910 F.2d 1422, 1429-34 (7th Cir. 1990) (deliberate state interference with private rescue
attempt).  Hasenfus, 175 F.3d at 74.

which aggravated the vulnerability to that risk (presence of firearms in a home without supervision for Armijo, Coe's history of child sexual abuse for John).[11]

Defendants cite three additional First Circuit cases to show that John's allegations do not shock the conscience.  See Doc. No. 10 at 10-11.  None of them are fatal to John's claim.  One, Cruz-Erazo, held that plaintiffs alleging that defendants "deliberately lied in official documents and perjured themselves in official court proceedings with the intention of causing [them] harm" failed to state a substantive due process claim, because such conduct did not shock the conscience.  212 F.3d at 620, 623.  A second case, Frei v. Town of Holland, 212 F. App'x 4, 6 (1st Cir. 2007), then relied on Cruz-Erazo to affirm judgment on the pleadings for defendants who allegedly engaged in "perjury, falsification of documents, and retaliatory actions."

Two factors undermine these cases' precedential potency.  First, Cruz-Eraso preceded Hasnefus's discussion of Armijo—by implication, then, nothing in Cruz-Eraso precluded Hasenfus from looking to Armijo as a potentially-correct application of substantive due process doctrine.  And because Frei, beyond being unpublished, relied solely on Cruz-Eraso for its shock-the-conscience holding, it likewise does not alter the Hasenfus analysis.

Second, Cruz-Erazo emphasized that the bulk of the alleged misconduct was "not physically intrusive or violent, nor did it strike at the basic fabric of any protected relationship, such as the parent-child relationship."  Id. at 623.  While John does not allege any violent conduct on Defendants' part, he does allege that their misconduct subjected him to violence.

---

[11] Similarly, the Western District of Pennsylvania held in Billingsley v. Franklin Area Sch. Dist., C.A. No. 11-160, 2012 WL 259992 (Jan. 27, 2012), that a plaintiff student raped at school by another student stated a state-created danger claim against a teacher who knew about the rapist's past history of sexual abuse and tendency to act sexually aggressively towards female students and nevertheless, shortly after issuing the plaintiff a hall pass, issued the rapist one as well, knowing that the plaintiff was alone and unsupervised in the halls.

Cruz-Erazo and Frei, lacking this exposure to violence, thus contain less conscience-shocking features than John's Complaint.

Defendants' third cited case, McConkie v. Nichols, 446 F.3d 258 (1st Cir. 2006), likewise does not defeat John's claims.  In McConkie, a detective falsely told a suspect in a child molestation investigation that the suspect's conversations with the detective would remain confidential.  Id. at 260.  McConkie confessed to the crime, and the prosecution introduced his self-incriminatory statements in McConkie's trial.  Id.  McKonkie subsequently brought a § 1983 suit, alleging that the detective's lies shocked the conscience, violating his substantive due process rights.  Id.  The McConkie Court observed that "there [wa]s no evidence that [the detective] was trying to elicit a false confession.  In fact, [he] told McConkie that he just wanted the truth," and this benign purpose helped them hold that, "as a matter of law, [the detective] did not engage in conduct that shocks the conscience."  Id. at 262.  Here, by contrast, Defendants allegedly acted solely out of fiscal concerns, with little regard to anyone rendered vulnerable to Coe in the process.  The Court accordingly has little trouble distinguishing misrepresentations made to solve an open case of child sexual abuse from an alleged effort to encourage a friendship between two children, one of whom is known as a sexual abuser of children, solely to save some money.

For the reasons mentioned above, the Court finds that the alleged conduct stated a claim for violation of John's constitutional rights.  This determination alone, however, does not render any defendant liable.  Each Served Defendant raises issues regarding the Counts against them that may bar John from recovery.  The Court examines these arguments in turn.

1.      *Count I-Qualified Immunity for Moskowitz-Dodyk*

Moskowitz-Dodyk argues that, even if her conduct violated John's constitutional rights, she is entitled to qualified immunity.  Doc. No. 10 at 11-12.  Having decided that John's Complaint sufficiently alleges a violation of his constitutional rights, the Court next addresses the qualified immunity defense.  See Pearson v. Callahan, 555 U.S. 223, 236 (2009) ("The judges of the district courts . . . should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the particular circumstances in the particular case at hand.").

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Stamps v. Town of Framingham, 813 F.3d 27, 33 (1st Cir. 2016) (internal citations and quotations omitted).  "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what [s]he is doing violates that right."  Id. (internal citations and quotations omitted).  "Qualified immunity is available to the defendants if, at the time of the alleged violations, the law was not clearly established."  Savard.v. Rhode Island, 320 F.3d 34, 38 (1st Cir. 2003).  "The dispositive question is whether the violative nature of particular conduct is clearly established.  This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition."  Mullenix v. Luna, 136 S.Ct. 305, 308 (2015) (internal citations and quotations omitted) (emphasis in original).  This Court looks to Supreme Court and First Circuit precedent, as well as cases from other circuits, to determine whether law is clearly established.  Savard, 320 F.3d at 38.

Following the Supreme Court's admonition in <u>Mullenix</u>, the Court examines whether Moskowitz-Dodyk's particular conduct regarding her repeated encouragement of a friendship between Coe and Philip violated John's constitutional rights, as clearly established between 1998 and 2000.  Without ascending to too-high levels of abstraction, the First Circuit's most apposite discussion of the state-created danger doctrine was the 1999 case <u>Hasenfus</u>, in particular its discussion of the factually-similar <u>Armijo</u>.  And the same dicta which enabled this Court to hold that John suffered a constitutional rights violation also provides enough flexibility to preclude finding sufficient clarity to overcome Moskowitz-Dodyk's qualified immunity.  <u>Hasenfus</u> specifically mentioned that "the facts in [<u>Armijo</u>] go a step beyond the typical endangerment cases cited by the Tenth Circuit, cases that involve manifestly outrageous behavior by the authorities certain to cause harm."  175 F.3d at 74.  This distinguishing of <u>Armijo</u> from "typical endangerment cases," combined with the expressed equivocation on <u>Armijo's</u> correctness, <u>see</u> <u>id.</u> ("<u>If sound</u>, The Tenth Circuit decision is at the outer limit, and does not come close to embracing Kempton's actions.") (emphasis added), underscore, at least within the First Circuit between 1998 and 2000, that the law did not clearly establish that Moskowitz-Dodyk acted unconstitutionally towards John.  A reasonable officer could read that portion of <u>Hasenfus</u> and conclude that Moskowitz-Dodyk's conduct was not unlawful.  <u>C.f.</u> <u>Taylor v. Barkes</u>, 135 S.Ct 2042, 2044 (2015) ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.") (quoting <u>Ashcroft v. al-Kidd</u>, 131 S.Ct. 2074, 2083 (2011)).

In opposition, John first argues that, for several decades, courts have recognized a right to bodily integrity, that sexual abuse infringes this right, and that state-created dangers may violate the Fourteenth Amendment.  Doc. No. 13 at 14.  As discussed, however, these broad statements

discuss Fourteenth Amendment rights at too high a level of generality.  See, e.g., Mullenix, 136 S.Ct. at 309 ("In this case, Mullenix confronted a reportedly intoxicated fugitive, set on avoiding capture through high-speed vehicular flight, who twice during his flight had threatened to shoot police officers, and who was moments away from encountering an officer at Cemetery Road. The relevant inquiry is whether existing precedent placed the conclusion that Mullenix acted unreasonably in these circumstances 'beyond debate.'  The general principle that deadly force requires a sufficient threat hardly settles this matter.") (internal citations omitted); Wilson v. Layne, 526 U.S. 603, 615 (1999) ("It could plausibly be asserted that any violation of the Fourth Amendment is 'clearly established,' since it is clearly established that the protections of the Fourth Amendment apply to the actions of the police. . . . In this case, the appropriate question is the objective inquiry whether a reasonable officer could have believed that bringing members of the media into a home during the execution of an arrest warrant was lawful, in light of clearly established law and the information the officers possessed.").

John next cites Billingsley v. Franklin Area Sch. Dist., C.A. No. 11-160, 2012 WL 259992 (W.D. Pa. Jan. 27, 2012) as an example of a court denying qualified immunity when a defendant "gave a known perpetrator of sexual abuse access to" the victim plaintiff.  Doc. No. 13 at 14.  However, Billingsley relied exclusively on Third Circuit case law, and thus did not face anything similar to Hasenfus's ambiguous dicta.  See 2012 WL 259992, at * 7 (citing Third Circuit cases).  Accordingly, it has little persuasive value here.  Thus, for the above reasons, Moskowitz-Dodyk has qualified immunity, and so the motion is ALLOWED for Count I.[12]

---

[12] On additional argument, which John did not raise, warrants brief discussion.  At least one court has held "that even in the absence of precedent, conduct that shocks the conscience is so patently egregious that the constitutional right it violates is necessarily clearly established and that a reasonable officer should know that his conduct violates that right."  Grendell v. Gillway, 974 F. Supp. 46, 52 (D. Me. 1997).  However, the First Circuit implicitly rejected this in Soto v.

2.      *Counts II and III-Municipal Liability for Wayland and TEC*

Counts II and III of John's Complaint allege that Wayland and TEC "encouraged friendships between students, even where a student pose[d] a threat to others, as a means of increasing retention in the TEC program." Doc. No. 7 ¶ 54. While municipalities face liability when "action pursuant to official municipal policy of some nature cause[s] a constitutional tort," they "cannot be held liable under § 1983 on a respondeat superior theory." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978). Defendants contend that John's "claims against the Town and TEC are based solely on the acts or omission of Dr. Dodyk and other school staff members for whom the Town and TEC should (in his view) be held vicariously liable." Doc. No. 10 at 14. Because "municaplit[ies] do[] not have available a qualified immunity defense with respect to damages claims alleged to result from [their] own constitutional infractions," Haley v. City of Boston, 657 F.3d 39, 51 (1st Cir. 2011), the Court proceeds directly to examining whether John has sufficiently alleged a claim under Monell against Wayland and TEC.[13]

Plaintiffs must prove two elements for municipal liability claims. "First, the custom must be attributable to the municipality. That is, it must be 'so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice.'" Whitfield v. Melendez-Rivera, 431 F.3d 1, 13 (1st Cir. 2005) (quoting Bordanaro v. McLeod, 871 F.2d 1151, 1156 (1st Cir. 1989)). Next, "the custom must have been the cause of and 'the moving force behind' the constitutional

---

Flores, 103 F.3d 1056, 1064-65 (1997), when it assumed, without deciding, that the defendant officers violated the plaintiff's substantive due process rights, but dismissed the claim on qualified immunity grounds. Such a result is impossible under Grendell's rule, as deeming any conduct conscience-shocking would automatically require likewise denying qualified immunity.
[13] Neither side provides any reason why the Court should treat Wayland and TEC differently, and the Court cannot discern one. Accordingly, identical analysis governs Counts II and III.

violation." Id. (quoting Bordanaro, 871 F.2d at 1156). "Although liability may not be imposed on a municipality for a single instance of misconduct by an official without final policymaking authority, liability may be imposed on a municipality for 'a single decision by a final policymaker.'" Rodriguez-Garcia v. Miranda-Marin, 610 F.3d 756, 769 (1st Cir. 2010) (quoting Welch v. Ciampa, 5412 F.3d 927, 942 (1st Cir. 2008)) (emphasis in original).

John has no trouble alleging causation—without the school's encouragement, the Court can infer that Coe would not have sexually abused John. The parties' dispute centers instead on whether John has alleged sufficient factual matter showing that Wayland and TEC had a custom or policy of encouraging students to form friendships with other students, even those posing safety risks, to increase the number of students enrolled in TEC programs. And because John does not allege that any staffer involved in the alleged misconduct possessed final policymaking authority, he must show instead that such misconduct was sufficiently pervasive to rise to the level of custom or policy.

The Supreme Court held in City of Oklahoma City v. Tuttle, 471 U.S. 808, 823-24 (1985), that "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under Monell, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." Subsequent First Circuit cases make clear, however, that John's allegations do not fall within Tuttle's holding.

In Kibbe v. City of Springfield, 777 F.2d 801, 807 (1985), decided shortly after Tuttle, the First Circuit denied a municipal defendant's motions for judgment notwithstanding the verdict and a directed verdict stemming from a fatal motor vehicle pursuit involving ten officers where, over the course of a single evening, three officers discharged their weapons during three

distinct shootings.  <u>Kibbe</u> held that "<u>Tuttle's</u> 'single incident' holding does not preclude municipal liability, as a matter of law, simply because the police officers' actions occurred within a 'single' evening."  <u>Id.</u> at 806.  The <u>Kibbe</u> Court observed that "the widespread activity here is more likely to reflect the operating procedures of the police department than would a single incident such as occurred in <u>Tuttle</u>."[14]

Twenty years later, the First Circuit reaffirmed <u>Kibbe</u>—and its distinction with <u>Tuttle</u>—in <u>Baron v. Suffolk Cty. Sheriff's Dep't</u>, 402 F.3d 225, 239 (2005).  "Baron reported multiple incidents of harassment, including physical threats and property destruction," to three different officials.  <u>Id.</u>  He also spoke with two union officials about his harassment.  <u>Id.</u>  The First Circuit affirmed denial of the municipal defendant's motions for judgment as a matter of law or a new trial on the basis of insufficient evidence, observing that <u>Baron</u> did not involve "attributing liability to the municipality based on a single incident of isolated employee conduct.  Rather, the record demonstrates a pattern of ongoing harassment that the jury could have found high-ranking Department officials were aware of and did not stop."  <u>Id.</u>  Importantly, the <u>Baron</u> Court then specifically compared <u>Kibbe</u> to <u>Tuttle</u> in support of this proposition.

John's allegations align with <u>Kibbe</u> and <u>Baron</u>.  Although he only alleges conduct pertaining to one particular friendship—the one between Coe and Philip—he alleges multiple instances of misconduct regarding that friendship.  These include: staffers' encouragement of Coe and Philip to form a friendship with each other; staffers' advocating to Sarah and Robert at multiple meetings that Philip's friendship with Coe was beneficial to Philip—including via specific affirmative representations that Coe was "a good kid" and "good with kids"; continued encouragement of the Coe-Philip friendship, even after learning about Coe's abuse of Rachel;

---

[14] "<u>Tuttle</u> involved only one officer who fired one shot."  <u>Kibbe</u>, 777 F.3d at 805.

and Moskowitz-Dodyk's reference to Philip's friendship with Coe as a reason for Sarah to not remove Philip from LVC.  The Complaint also contains numerous inappropriate omissions from Wayland and TEC staff—failure to exclude Coe from LVC; failure to inform Sarah and Robert about Coe's past sexual abuse; failure to remove Coe from LVC after he sexually abused Rachel; failure to inform Rachel's parents about Coe's sexual abuse of Rachel; and failure to inform the Does about Coe's sexual abuse of Rachel—which, though not unconstitutional, offers factual support for an inference that socially engineering dangerous friendships was an official custom or policy.  This systemic pattern of activity compels the Court to find John's allegations "more akin to the serial misconduct cases than to cases implicating the single incident rule." Id. Accordingly, the motion is DENIED for Counts II and III.

     B.     Title IX Claims (Counts IV and V)

John's final two claims for relief are for Title IX violations by Wayland (Count IV) and TEC (Count V).  He posits two theories of liability for each defendant—deliberate indifference and retaliation.  Defendants have moved to dismiss both Counts, on grounds that, if true, are fatal to both theories.  See Doc. No. 10 at 14-19; id. at 17 n. 12.  However, Defendants' arguments turn on factual questions which discovery may help illuminate.

For example, the argument that John did not suffer discrimination because of sex relies on the contention that John's alleged predicate act of discrimination was Defendants' differential treatment of him as a sexual abuse victim.  See id. at 15.  However, the alleged predicate act of sex discrimination was actually Coe's molestation of John, and discovery will reveal the role that John's sex played in that.  Likewise, whether or not Defendants acted with deliberate indifference towards John, see id. at 17-19, depends on, among other things: John's behavior after Coe's abuse; what certain Staffers knew about John; when they knew it; and how John

responded to particular interventions.  These fact-bound questions require more discovery.[15]

Accordingly, the motion is DENIED WITHOUT PREJUDICE as to Counts IV and V, and

Defendants may renew it at summary judgment.

IV.    CONCLUSION

    For the foregoing reasons, Defendants' Motion to Dismiss for Failure to State a Claim,

Doc. No. 9, is ALLOWED IN PART and DENIED IN PART. The Court will hold a Rule 16

Scheduling Conference on May 2, 2016 at 2:30 p.m.


                        SO ORDERED.


                         /s/ Leo T. Sorokin
                        Leo T. Sorokin
                        United States District Judge

---

[15] To prevail on his Title IX claims, John will also have to show that his abuse took place in the school's "programs or activities."  Puerto v. Town of Tewksbury, 488 F.3d 67, 73 (1st Cir. 2007).  Discovery will clarify just how instrumental Defendants were in facilitating Coe's visit to the Doe household, and how aware of the risk they were.  See Simpson v. Univ of Colo. Boulder, 500 F.3d 1170, 1184-85 (10th Cir. 2007) (reversing a grant of summary judgment to defendant university when the record supported inferences that the head football coach knew that visiting high-school recruits faced elevated risks of sexual assaults during college visits but still "maintained an unsupervised player-host program to show high-school recruits 'a good time'").